**John F. VAN de ZILVER, Jr., Plaintiff,**

v.

**RUTGERS UNIVERSITY,**
**et al., Defendants.**

**Civil Action No. 97–806.**

United States District Court,
D. New Jersey.

Aug. 1, 1997.

Allen A. Etish, John A. Zohlman, III, Kenney & Kearney, Cherry Hill, NJ, for Plaintiff.

Gavin J. Rooney, Lowenstein, Sandler, Kohl, Fisher & Boylan, A Professional Corporation, Roseland, NJ, for Defendant, Rutgers, The State University of New Jersey.

Peter Verniero, Attorney General of New Jersey, Katherine L. Suga, Senior Deputy Attorney General, Bindi S. Chandarana, Deputy Attorney General of New Jersey, State of New Jersey Department of Law and Public Safety, Division of Law, Newark, NJ, for Defendants, University of Medicine and Dentistry of New Jersey and Dr. David Seiden.

## OPINION

ORLOFSKY, District Judge.

This case requires this Court to decide whether a University's decision not to admit a student to its medical school based upon the faculty's evaluation of the student's academic record and certain "noncognitive factors that [cannot] be easily assessed from transcripts, standardized test scores or ... letters of recommendation" may be overturned by this Court. After carefully reviewing the undisputed material facts of

record in light of well established legal precedent, I conclude that I cannot override the professional judgment of the faculty.

This matter arises out of Plaintiff's dismissal from the joint BA/MD Program offered by Rutgers, the State University of New Jersey ("Rutgers"), and the Robert Wood Johnson Medical School of the University of Medicine and Dentistry of New Jersey ("UMDNJ"), after the completion of four years of an anticipated seven or eight year program, in which Plaintiff received his undergraduate degree, but was not admitted to the Medical School. Plaintiff contends that he is entitled to reinstatement into the Defendants' program and admission to the Medical School for the following reasons: (1) Defendants' failure to promulgate objective standards by which to evaluate Plaintiff's performance deprived Plaintiff of his right to substantive due process; (2) In terminating Plaintiff, the Defendants treated him differently than other similarly situated students, depriving him of his right to equal protection under the law; (3) In terminating Plaintiff from the program, the Defendants discriminated against him because of his race and gender in violation of Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d and 2000e *et seq.,* and New Jersey's Law Against Discrimination, N.J.S.A. §§ 10:5–1 *et seq.;* (4) Plaintiff's termination from the program was in violation of his right to procedural due process; and (5) Defendants are equitably estopped from terminating Plaintiff from the program.

Plaintiff has moved for summary judgment, or in the alternative, for an order compelling Defendants to divulge the gender and race of all current and former Joint Program students and a trial date certain for August 1997. Defendants have cross-moved for summary judgment. Jurisdiction is conferred upon this Court, pursuant to 28 U.S.C. §§ 1331, 1343. For the reasons set forth below, Defendants' cross-motion for summary judgment will be granted and Plaintiff's motion will be denied.

## I. Background

### A. *The Joint Program*

Traditionally, undergraduate students gain admission to a medical school by completing a bachelor's degree with a "pre-med" concentration of course work, taking a medical school entrance exam, and applying for admission to medical school. In contrast, the Joint Bachelor/Medical Degree Program (the "Joint Program") offered by Rutgers and the UMDNJ provides an opportunity for undergraduate students at Rutgers to take medical school courses for undergraduate credit, and, at the end of their senior year, be considered for admission to UMDNJ without going through the traditional admission process. (Seiden Aff. ¶¶ 1–16).

The Joint Program's policies and procedures are set forth in the Joint Bachelor/Medical Degree Program Handbook ("Handbook"), which is distributed to all Joint Program participants. (*Id.* ¶ 3, Ex. A). The Handbook provides that admission to the Joint Program "is a two stage and highly competitive process." (*Id.*) In the first stage, undergraduate students at Rutgers apply for admission to the Joint Program, typically in their sophomore year. (*Id.* ¶ 5). An Admissions Committee comprised of faculty from both Rutgers and UMDNJ reviews and acts upon these applications. However, the Joint Program does not itself offer a degree. (*Id.* ¶ 7).

If a student successfully passes this first stage of the admissions process, the student then takes a combined course of study consisting of Rutgers undergraduate courses and UMDNJ medical school courses during his or her junior and senior years of college. During the student's junior and senior years, the student remains matriculated at Rutgers as an undergraduate and is not enrolled or matriculated at the Medical School. (*Id.* ¶ 7). The academic credits for the medical school courses apply towards the students' undergraduate degrees. (*Id.* ¶¶ 5–9, Ex. A).

The second stage of the admissions process typically occurs at the end of the student's senior year as a Rutgers undergraduate. At that time, the Joint Program's Admissions Committee reviews each Joint Program participant "to ascertain that the student has maintained adequate academic

and nonacademic qualities appropriate for retention in the medical school." (*Id.* ¶¶ 11–16, Ex. A). The Handbook states, however, that this second stage of the review process is "noncompetitive," in that there are enough slots in the Medical School for each Joint Program participant, provided that each participant demonstrates the qualities required for admission to the Medical School. (*Id.*, Ex. A). Although the Joint Program Admissions Committee determines whether to recommend that a particular student be admitted to the Medical School, the final decision rests with the Robert Wood Johnson Medical School Admissions Committee. (*Id.* ¶¶ 11–16, 41, Ex. A).

The Handbook further provides that during the second stage of the admissions process, the Admissions Committee looks at both the student's academic and nonacademic qualities. With regard to the academic criteria, the Handbook states that it is expected that students will have grades of "A" or "B" in their undergraduate courses and "Honors" or "High Pass" in courses taken at the Medical School. (*Id.*, Ex. A). The Handbook states that "it is essential that successful applicants be more mature than the norm for his or her age group," and that "noncognitive factors that will not be easily assessed from transcripts, standardized test scores or even letters of recommendation," will also be considered. (*Id.*, Ex. A).

If a student is not recommended for admission to the Medical School, he or she may receive a bachelor's degree from Rutgers and remains free to apply for admission to any medical school through the traditional process. (*Id.* ¶¶ 58, 61). After declining to recommend a student's admission to the Medical School, the Joint Program's Admission Committee may nevertheless grant a Joint Program participant an extra year to take courses at Rutgers and UMDNJ if it believes that a particular student could, with a second chance, demonstrate his or her worthiness for admission to the Medical School. This extra year of study, however, is not granted as a matter of course to any student whom the Admissions Committee declines to rec-

ommend for admission to the Medical School. (*Id.* ¶ 61).

## B. *John F. Van de Zilver, Jr.*

Plaintiff, John F. Van de Zilver, Jr., enrolled at Rutgers as a freshman undergraduate in the Fall of 1992. In his sophomore year, Plaintiff applied for admission to the Joint Program and successfully passed the first stage of the admissions process at that time. (Seiden Aff. ¶ 17). Plaintiff received a copy of the Handbook setting forth the Joint Program's policies and procedures. (Rooney Cert., Ex. A at 18–20).

During Plaintiff's first semester in the Joint Program in the fall of 1994, he received a "Low Pass" in Biochemistry and a "Pass" in Human Genetics in his medical school courses, and received a "C" in Genetics and an "A" in Principles of Abnormal Psychiatry in his Rutgers courses. (Plaintiff's Brief in Support of his Motion for Summary Judgment ("P.B."), Ex. A; Rooney Cert., Ex. E). The next semester, Plaintiff received a "Low Pass" in Microbiology and Immunology and a "Pass" in Human Nutrition in his medical school courses, and received a "C" in Molecular Genetics, a "B" in Cell Physiology and a "B +" in World Mythology in his Rutgers courses. (P.B., Ex. A; Rooney Cert., Ex. E).

On two occasions during Plaintiff's first year in the Joint Program, Plaintiff met with his Joint Program faculty advisor, Dr. David Seiden. On both occasions, Dr. Seiden advised Plaintiff that he needed to improve his grades and referred him to the Cognitive Skills Program offered by UMDNJ to assist students with academic problems. (Seiden Aff., ¶¶ 27–29, Ex. B). Plaintiff acknowledged that his "back is against the wall," and that he had to "get on the ball" and improve his grades. (Rooney Cert., Ex. A at 66, 67, 70, 71).

Plaintiff met with Dr. Seiden again in August 1995, at the end of Plaintiff's first year in the Joint Program. At that meeting, Plaintiff acknowledged that he had not enrolled in the Cognitive Skills Program, as Dr. Seiden had suggested. Dr. Seiden then advised Plaintiff that simply earning "Passes" in his medical school courses was not sufficient, and that he was in great danger of not

being advanced into the Medical School the next year. At this meeting, Dr. Seiden further suggested to Plaintiff that he consider dropping out of the Joint Program to avoid prejudicing his chances for admission to medical school in the traditional way. (Rooney Cert., Ex. A at 73; Seiden Aff. ¶¶ 31–37, Ex. C).

Plaintiff's grades improved little during his senior year. In the Fall 1995, semester, Plaintiff received a "Low Pass" in Cell Biology and Histology and a "Pass" in Gross & Developmental Anatomy in his medical school courses and a "B+" in his Rutgers course, Theater Appreciation. (P.B., Ex. A). Although Plaintiff may have improved his Cell Biology and Histology grade by taking a re-test, Plaintiff acknowledged that he chose not to do so. (Rooney Cert., Ex. A at 45–46).

In the Spring 1996, semester, Plaintiff received "Passes" in his Physiology and Neuroscience classes taken at the Medical School, and received a "B+" in his Rutgers course, Introduction to Music. (Seiden Aff. ¶ 43; Rooney Cert. Ex. E). In order to be eligible to receive a "High Pass" or "Honors" in Neuroscience, students had to write a paper, which Plaintiff chose not to do, thereby making him ineligible for a grade of "High Pass" or "Honors." (P.B., Ex. A; Rooney Cert., Ex. A at 47; Seiden Aff. ¶ 46).

Towards the end of the Spring 1996, semester, the Joint Program's Admissions Committee met to decide whether to recommend the Program's participants for admission to the Medical School. The Admissions Committee, however, chose to defer its decision regarding Plaintiff until after receipt of the Spring 1996, grades. (Seiden Aff., ¶ 40).

After receiving Plaintiff's Spring 1996, grades, the Admissions Committee met again on June 6, 1996, to decide whether to recommend Plaintiff for admission to the Medical School. At that meeting, the Committee unanimously voted not to recommend Plaintiff's admission to the Medical School. (Seiden Aff. ¶ 44). The Committee noted several factors that it considered in reaching its decision.

First, the Committee noted that Plaintiff had fallen far short of the academic criteria stated in the Handbook, as he had failed to achieve an "Honors" or "High Pass" grade in any of his courses taken at the Medical School and had received a large number of "C's" in his Rutgers courses. The Committee also noted that Plaintiff's grades were consistently poor throughout his four semesters in the Joint Program and were not a temporary aberration. (Seiden Aff. ¶¶ 45, 46, 47).

The Committee also found that, in numerous ways, Plaintiff had failed to demonstrate the maturity, dedication and nonacademic qualities expected of Joint Program participants. The Committee noted that Plaintiff failed to participate in the Cognitive Skills Program, notwithstanding Dr. Seiden's advice, given on two occasions, to do so. In addition, the Committee pointed to Plaintiff's failure to take advantage of several opportunities to improve his grades, as well as the fact that Plaintiff showed a tendency to receive "C's" in his science courses at Rutgers that were most relevant to medical school. (*Id.* ¶¶ 44–48, 59). By letter dated June 6, 1996, Plaintiff was advised of the Joint Committee's decision not to recommend his admission to the Medical School. (*Id.*, Ex. E).

Dr. Seiden then advised Plaintiff that there was an appeal process to the Joint Committee. (*Id.* ¶ 49). Plaintiff informed Dr. Seiden that he wished to pursue the appeal and a hearing was scheduled for July 1, 1996, before the Joint Committee to consider Plaintiff's appeal. Prior to the July 1, 1996, hearing, Plaintiff met with Dr. Seiden on several occasions to discuss the reasons behind the Committee's decision. (*Id.* ¶ 50).

At the July 1, 1996, hearing before the Committee, Plaintiff was permitted the opportunity to articulate the reasons why he felt the Committee should have recommended his admission to the Medical School. (Seiden Aff. ¶ 51; Rooney Aff., Ex. A at 95–98). After the Admissions Committee had an opportunity to hear from the Plaintiff and ask him questions concerning his performance, the Committee discussed its recommendation for Plaintiff. (Seiden Aff. ¶ 56). No one on the Committee supported Plaintiff's admission to the Medical School. (*Id.* ¶ 57). While the Committee did consider

permitting Plaintiff to remain in the Joint Program an additional year, it ultimately decided not to grant Plaintiff the additional year, believing that there was no reason to expect that Plaintiff would benefit from it. (*Id.* ¶¶ 58–59, 61). Plaintiff nonetheless received his bachelors degree from Rutgers in May of 1996. (Rooney Cert., Ex. A at 6).

## II. Summary Judgment Standard

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that [he or she] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the Court must view all inferences, doubts and issues of credibility in favor of the non-moving party. *See Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir.1987) (citation omitted); *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Moreover, Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

Under this rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except for those for which its opponent has provided evidence to show that a question of material fact remains. Put another way, once the moving party has properly supported its motion, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A summary judgment movant may meet its burden by showing that the opposing party is unable to meet its burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986) Nonetheless, the moving party on the motion, bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Id.*

## III. Discussion

### A. *Plaintiff's Due Process Claims*

#### (i) *Procedural Due Process*

Plaintiff contends that the Defendants, by terminating[1] him from the Joint Program, violated 42 U.S.C. § 1983, by depriving him of his right to procedural due process. To be entitled to the procedural protections of the Fourteenth Amendment, a plaintiff must demonstrate that he or she was deprived of either a liberty or property interest. *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 82, 98 S.Ct. 948, 951, 55 L.Ed.2d 124 (1978). In order to have a constitutionally-protected property interest, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Plaintiff claims that he has a constitutionally-protected property interest in his contin-

---

**1.** The parties dispute whether Plaintiff was "terminated" from the Joint Program, or simply "not recommended" to continue into the second phase of the Joint Program. Such a distinction is immaterial to my holding in this case, since I find that, even if Plaintiff were "terminated," rather than "not recommended" to continue to the second phase, his due process rights were not violated.

ued enrollment in the Joint Program. However, I need not decide whether Plaintiff's dismissal from the Joint Program deprived him of a constitutionally protected property interest, because even assuming that Plaintiff does have such a constitutionally-protected property interest, I find that Plaintiff has received as much due process as the Fourteenth Amendment requires.

■ Due process is not a fixed concept, but a flexible doctrine that varies with the particular circumstances. *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990). Essentially, the "requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Kahn v. United States*, 753 F.2d 1208, 1218 (3d Cir.1985).

The United States Supreme Court has specifically addressed the "procedures [which] must be accorded to a student at a state educational institution whose dismissal may constitute a deprivation of 'liberty' or 'property' within the meaning of the Fourteenth Amendment." *Horowitz*, 435 U.S. at 80, 98 S.Ct. at 950. This is the precise issue presently before this Court.

In *Horowitz*, the respondent, Charlotte Horowitz, was dismissed by Missouri–Kansas City Medical School during her final year of study for failure to meet academic standards. *Id.* at 79, 98 S.Ct. at 949–50. As a result, Horowitz sued the University, alleging, among other things, that the Medical School did not accord her due process prior to her dismissal. *Id.* at 80, 98 S.Ct. at 950.

Assuming, without deciding, that Horowitz had a constitutionally-protected interest in pursuing a medical career, the Supreme Court went on to discuss the nature and extent of the due process which must be provided before an educational institution may dismiss a student for academic reasons. *Id.* at 87–89, 98 S.Ct. at 953–55. In so doing, the Court rejected the Eighth Circuit's determination that Horowitz was entitled to a formal hearing before her dismissal on academic grounds. The Court noted that the prior decisions of state and federal courts over a period of sixty years have unanimously held "that formal hearings before decision-making bodies need not be held in the case of

academic dismissals." *Id.* at 88, 98 S.Ct. at 954.

■ The Court in *Horowitz* held that the due process requirements of "giving effective notice" and having an "informal hearing permitting the student to give his version of the events," set forth in the context of a student's dismissal for *disciplinary* reasons in *Goss v. Lopez*, 419 U.S. 565, 583–84, 95 S.Ct. 729, 740–41, 42 L.Ed.2d 725 (1975), did not apply to a dismissal for academic reasons. *Horowitz*, 435 U.S. at 88–89, 98 S.Ct. at 954–55. In so holding, the Court noted that a dismissal for academic reasons:

> is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

*Id.* at 90, 98 S.Ct. at 955. Indeed, the Court recognized that "judicial presence in the academic community ... risk[s] deterioration of the many beneficial aspects of the faculty-student relationship" and that a hearing in such a context "may be 'useless or harmful in finding out the truth as to scholarship.'" *Id.* at 90, 98 S.Ct. at 955 (citing *Barnard v. Inhabitants of Shelburne*, 216 Mass. 19, 102 N.E. 1095, 1097 (1913)).

■ In *Horowitz*, the Court found that the record revealed that prior to the respondent's dismissal, "[t]he school fully informed respondent of the faculty's dissatisfaction with her clinical progress and the danger that this posed of timely graduation and continued enrollment," and that "[t]he ultimate decision to dismiss respondent was careful and deliberate." *Id.* at 85, 98 S.Ct. at 952. The Court held that "[t]hese procedures were sufficient under the Due Process Clause of the Fourteenth Amendment." *Id.* Indeed, the Court of Appeals for the Third Circuit has construed *Horowitz* to require no more than "an informal faculty evaluation with the student," prior to an academic dismissal.

*Mauriello v. University of Med. & Dentistry of N.J.*, 781 F.2d 46, 50–51 (3d Cir.1986). *See also Hankins v. Temple University*, 829 F.2d 437, 445 (3d Cir.1987) ("when a student is discharged for academic reasons, an informal faculty evaluation is all that is required").

▇ Applying the standard set forth in *Horowitz* and its progeny to the facts of this case, it is clear that Plaintiff was afforded all of the due process to which he is entitled under the circumstances pursuant to the Fourteenth Amendment. First, the undisputed facts contained in the summary judgment record reveal that, on numerous occasions, his Joint Program faculty advisor, Dr. Seiden, informed Plaintiff of his dissatisfaction with Plaintiff's academic performance. Specifically, on two occasions during Plaintiff's first year in the Joint Program, Dr. Seiden advised Plaintiff that he needed to improve his grades, that his "back is against the wall," and that he had to "get on the ball" and improve his grades. (Seiden Aff., ¶¶ 27–29, Ex. B; Rooney Cert., Ex. A at 66, 67, 70, 71).

In addition, Plaintiff met with Dr. Seiden again in August 1995. At that time, Dr. Seiden advised Plaintiff that simply earning "Passes" in his medical school courses was not sufficient and that he was in great danger of not being advanced into the Medical School the next year. At this meeting, Dr. Seiden further suggested to Plaintiff that he consider dropping out of the Joint Program to avoid prejudicing his chances for admission to medical school in the traditional way. (Rooney Cert., Ex. A at 73; Seiden Aff. ¶¶ 31–37, Ex. C).

Second, it is equally clear that the ultimate decision to dismiss Plaintiff in this case was "careful and deliberate." *See Horowitz*, 435 U.S. at 85, 98 S.Ct. at 952. The undisputed facts contained in the summary judgment record reveal that towards the end of the Spring 1996, semester, the Joint Program's Admissions Committee met to decide whether to recommend the Program's participants for admission to the Medical School. Rather than render a premature decision, the Admissions Committee chose to defer its decision regarding Plaintiff until after receipt of

his Spring 1996, grades. (Seiden Aff. ¶ 40). After receiving Plaintiff's Spring 1996 grades, the Admissions Committee met again on June 6, 1996, to decide whether to recommend Plaintiff for admission to the Medical School. At that meeting, the Committee unanimously voted not to recommend Plaintiff's admission to the Medical School. (*Id.* ¶ 44).

The Committee noted several factors that it considered in reaching its decision. First, the Committee noted that Plaintiff had fallen far short of the academic criteria stated in the Handbook, as he had failed to achieve an "Honors" or "High Pass" grade in any of his courses taken at the Medical School and had received a large number of "C's" in his Rutgers courses. The Committee also noted that Plaintiff's grades were consistently poor throughout his four semesters in the Joint Program and were not a temporary aberration. The Committee also found that, in numerous ways, Plaintiff had failed to demonstrate the maturity, dedication and nonacademic qualities expected of Joint Program participants. The Committee noted that Plaintiff failed to participate in the Cognitive Skills Program notwithstanding Dr. Seiden's advice, given on two occasions, to do so. In addition, the Committee pointed to Plaintiff's failure to take advantage of several opportunities to improve his grades, as well as the fact that Plaintiff showed a tendency to receive "C's" in his science courses at Rutgers that were most relevant to medical school. (*Id.* ¶¶ 44–48, 59).

At the July 1, 1996, hearing before the Committee, Plaintiff was permitted the opportunity to articulate the reasons why he felt the Committee should have recommended his admission to the Medical School. After the Admissions Committee had an opportunity to hear from the Plaintiff and ask him questions concerning his performance, the Committee discussed its recommendation for Plaintiff. (*Id.* ¶ 56). No one on the Committee supported Plaintiff's admission to the Medical School. (*Id.* ¶ 57). While the Committee did consider permitting Plaintiff to remain in the Joint Program an additional year, it ultimately decided not to grant Plaintiff the additional year, believing that there

was no reason to expect that Plaintiff would benefit from it. (Seiden Aff. ¶¶ 58–59, 61).

Based upon these uncontroverted facts, I find that the Committee's decision-making process was sufficiently "careful and deliberate." *See Horowitz*, 435 U.S. at 85, 98 S.Ct. at 952. Moreover, the informal hearing before the Admissions Committee on July 1, 1996, afforded Plaintiff an opportunity to be heard, and thus provided Plaintiff with due process above and beyond what the United States Supreme Court has found to be required in this context. Accordingly, because Plaintiff has been accorded as much due process as the Constitution requires, I find that he cannot succeed on his claim for a violation of his right to procedural due process.

### (ii) *Substantive Due Process*

Plaintiff contends that the Defendants also violated § 1983 by dismissing him from the Joint Program, thereby depriving him of his right to substantive due process. (Complaint, Count I).

■ This Court is mindful of the Supreme Court's admonition that:

> [w]hen judges are asked to review the substance of a genuinely academic decision ... they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985) (footnote omitted). In *Ewing*, the Court further noted that:

> If a federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies, far less is it suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require an expert evaluation of cumulative information and [are] not readily adapted to the proce-

dural tools of judicial or administrative decisionmaking.

*Ewing*, 474 U.S. at 226, 106 S.Ct. at 514 (internal citations omitted).

■ Applying this very narrow standard of review to the facts of this case, I am compelled to conclude that the decision to dismiss Plaintiff from the Joint Program was not "such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment." *Id.* at 227, 106 S.Ct. at 514. Plaintiff has failed to come forth with any evidence whatsoever that the decision to terminate him from the Joint Program was the product of bad faith or ill will. Simply put, the record reveals that Plaintiff's grades did not reach the level of what was expected of Joint Program participants, as set forth in the Handbook. Whether or not other students with similar grades were terminated from the Joint Degree Program is not relevant to whether Plaintiff's right to substantive due process was violated, since the Supreme Court has instructed a court to examine a student's dismissal "in isolation," for purposes of substantive due process. *Ewing*, 474 U.S. at 227, 106 S.Ct. at 514.

Indeed, while the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them,'" *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) (citing *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)), the interest asserted by Plaintiff—the continued enrollment in the Joint Program,

> bears little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution. It certainly is not closely tied to "respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms."

*Ewing*, 474 U.S. at 229, 106 S.Ct. at 515–16 (Powell, J., concurring) (citing *Griswold v.*

Connecticut, 381 U.S. 479, 501, 85 S.Ct. 1678, 1690–91, 14 L.Ed.2d 510 (1965) (Harlan, J., concurring)).

Accordingly, the decision to terminate Plaintiff from the Joint Degree Program was not arbitrary, as it "rested on an academic judgment that is not beyond the pale of reasoned academic decision-making." *Id.* at 227–28, 106 S.Ct. at 514–15. *See also Mauriello*, 781 F.2d at 52. Therefore, I find that the undisputed facts contained in the summary judgment record demonstrate that Plaintiff cannot succeed on his substantive due process claim.

### B. *Plaintiff's Discrimination Claims*

#### (i) *Statutory Claims*

Plaintiff, a white male, also alleges that, in terminating him from the Joint Program, the Defendants discriminated against him because of his race and gender in violation of Titles VI [2] and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d and 2000e *et seq.*, and New Jersey's Law Against Discrimination, N.J.S.A. §§ 10:5–1 *et seq.* Assuming the applicability of these statutes to the present case, I find that the summary judgment record does not support such claims.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the United States Supreme Court established the basic framework for the allocation of the burden of proof in federal discrimination claims.[3] The law places the initial burden of production on the plaintiff to establish a *prima facie* case of discrimination. *Id.; see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). Once the plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the dis-

missal. *Hicks*, 509 U.S. at 506–07, 113 S.Ct. at 2746–47. Ultimately, if steps one and two are satisfied, the plaintiff must show that the defendant's proffered reasons are not worthy of belief and that the defendant acted with the intent to discriminate. *See McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25; *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997); *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200–02 (3d Cir.1994).

A defendant is entitled to summary judgment on a plaintiff's claim for discrimination if it can demonstrate that: (1) the plaintiff is unable to establish a *prima facie* case of discrimination; or (2) if the plaintiff can establish a *prima facie* case, the plaintiff cannot produce sufficient evidence of pretext to rebut the defendant's asserted legitimate reason for discharge. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994); *Jalil v. Avdel Corp.*, 873 F.2d 701, 706–07 (3d Cir. 1989). In order to establish a *prima facie* case of discrimination, a plaintiff must show that he or she is a member of a protected class, and that other, similarly situated individuals who are not in the plaintiff's class were treated more favorably.

In this case, the Defendants contend that Plaintiff is unable to establish a *prima facie* case of discrimination since he cannot show that other, similarly situated individuals who are not members of Plaintiff's class were treated more favorably. Plaintiff counters by alleging that he is similarly situated to Students A, B, 63, 33 and 47,[4] and that these students were treated more favorably since they were not dismissed from the Joint Program.

While I recognize the difficulty in showing that students are similarly situated where, as

---

2. Section 601 of Title VI provides, in relevant part, that:

   No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.
   42 U.S.C. § 2000d.

3. The same burden shifting analysis is applied in analyzing a discrimination claim brought pursuant to the NJLAD. *See Olson v. General Elec. Astrospace*, 101 F.3d 947, 956 (3d Cir.1996).

4. The students in Plaintiff's Joint Program are represented by letters, and the students in prior classes of the Joint Program are represented by numbers.

here, a number of both objective and subjective factors come into play, *see Ewing,* 474 U.S. at 228 n. 14, 106 S.Ct. at 515 n. 14 (noting the "insusceptibility of [academic] promotion decisions ... to rigorous judicial review"), my review of the summary judgment record, reveals that Plaintiff is indeed not similarly situated to any of the above students. First, the record reveals that Students A and B, both members of Plaintiff's class, had higher cumulative grade point averages than Plaintiff. (P.B., Exs. F and G). In fact, I do not see how Plaintiff could be similarly situated to anyone in his class since he had the lowest grade point average of anyone in his class.

Nor do I find that Plaintiff was similarly situated to Students 63, 33 or 47, members of prior Joint Degree Program classes. Although the grade point averages of these students were as low as that of Plaintiff, subjective factors, which the Handbook provides will be considered by the Admissions Committee, distinguish these students from Plaintiff. *See Ewing,* 474 U.S. at 228 n. 14, 106 S.Ct. at 515 n. 14 ("despite tables recording that some students with more incompletes or low grades were permitted to retake the examination after failing it the first time ... and charts indicating that these students lacked the outside research and honor grade in clinical work that Ewing received ... we are not in a position to say that these students were 'similarly situated' ").

While the Admissions Committee permitted Student 62 to remain in the Joint Degree Program for an extra year after initially declining to recommend her for admission to the Medical School, Student 62, unlike Plaintiff, demonstrated diligence by taking advantage of the remedial Cognitive Skills Program when Dr. Seiden advised her to do so. In addition, Student 62 earned nine "A's" in Rutgers courses, while Plaintiff received one. However, after failing to improve her performance during the extra year, the Admissions Committee ultimately declined to recommend her for admission to the Medical School.

The Admissions Committee also permitted Students 47 and 33 to remain in the Joint Degree Program for an extra year after initially declining to recommend them for admission. Student 47 took an especially heavy course load, entered Rutgers with advanced standing, was several years younger than his classmates and demonstrated a willingness to follow faculty advice. (P.B., Ex. D). In addition, Student 47 received more "High Passes" and fewer "Low Passes" than Plaintiff in medical school courses.

The record reflects that Student 33 is a white male, (Seiden Aff. ¶ 75), and therefore a member of the same "protected class" as the Plaintiff. Thus, whether Student 33 was treated more favorably than the Plaintiff is irrelevant for purposes of establishing a *prima facie* case of discrimination. However, Student 33 also demonstrated a willingness to follow faculty advice and was a participant in the Cook Honors Program which required him to research and write a thesis paper in addition to completing his Joint Program course work.

In contrast, the record reflects that Plaintiff lacked all of the subjective traits which set these students apart and led the Admissions Committee to conclude that they possessed the qualities necessary to succeed both in medical school and as physicians. Plaintiff's grades were consistently low and not the product of just one or two poor semesters. In addition, Plaintiff did not maintain an excessive course load. Plaintiff did not take Dr. Seiden's advice and enroll in the remedial Cognitive Skills Program. Plaintiff did not take advantage of various opportunities to improve his grades either by writing an additional paper or by retaking a test. Accordingly, because Plaintiff has not established that there are any "similarly situated" students who were treated more favorably, I find that Plaintiff cannot establish his *prima facie* case of discrimination.

Moreover, even if the Plaintiff were able to establish that similarly situated students who are not white males were treated more favorably, thereby establishing a *prima facie* case of discrimination, I find that Defendants have set forth evidence of a legitimate non-discriminatory reason for his dismissal. The Admissions Committee, in deciding to dismiss Plaintiff from the Joint Degree Program, first noted that Plaintiff had fallen far

short of the academic criteria stated in the Handbook, that he had failed to achieve an "Honors" or "High Pass" grade in any of his courses taken at the Medical School and had received a large number of "C's" in his Rutgers courses. The Committee also noted that Plaintiff's grades were consistently poor throughout his four semesters in the Joint Program and were not a temporary aberration.

The Committee also found that, in numerous ways, Plaintiff had failed to demonstrate the maturity, dedication and nonacademic qualities expected of Joint Program participants. The Committee noted that Plaintiff failed to participate in the Cognitive Skills Program notwithstanding Dr. Seiden's advice, given on two occasions, to do so. In addition, the Committee pointed to Plaintiff's failure to take advantage of several opportunities to improve his grades, as well as the fact that Plaintiff showed a tendency to receive "C's" in his science courses at Rutgers that were most relevant to medical school. (Seiden Aff. ¶¶ 44–48, 59).

Once a defendant succeeds in setting forth a legitimate nondiscriminatory reason for the dismissal, the burden then shifts to the plaintiff to show that the defendant's reasons are a mere pretext for discrimination. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *McDonnell Douglas,* 411 U.S. at 803–04, 93 S.Ct. at 1824–25; *Fuentes,* 32 F.3d at 764. Pretext may be shown " 'directly by persuading the court that a discriminatory reason more likely motivated" the decision, or "indirectly by showing that the . . . proffered reason is unworthy of credence.' " *United States Postal Service v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). To discredit a defendant's proffered reason, however:

> the plaintiff cannot simply show that the . . . decision was wrong or mistaken . . . Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the . . . proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence.

*Fuentes,* 32 F.3d at 765.

Moreover, a plaintiff cannot "avoid summary judgment simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations." *Id.* at 764. Instead, in order to avoid summary judgment, Plaintiff must point to " 'some' evidence from which a factfinder could reasonably conclude that the proffered reasons were fabricated." *Id.*

In this case, the summary judgment record is devoid of any evidence whatsoever to discredit the Defendants' proffered reasons for Plaintiff's dismissal from the Joint Program, or to show that their reasons are unworthy of belief. Plaintiff's mere unsubstantiated allegations are insufficient to defeat summary judgment. *See Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (once the moving party has properly supported its motion, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts").

In addition, Dr. Seiden has testified that the Admissions Committee "does not employ any sort of Affirmative Action plan. Nor does the Joint Program have a policy or practice of favoring minority students or disfavoring white males." (Seiden Aff. ¶ 10). It is also significant to note that Joint Program participants do not compete for a limited number of admission slots in the Medical School. As a result, the Admissions Committee would have no reason to discriminate among the students for any reason. Moreover, the only student other than Plaintiff who was not recommended for admission to the Medical School, Student 62, is an Hispanic female, negating any theory of a pattern of discrimination against white males.

Accordingly, for the reasons set forth above, this Court will grant Defendants summary judgment on Plaintiff's claims of discrimination in violation of Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d and 2000e, and New Jersey's Law

938

Against Discrimination, N.J.S.A. §§ 10:5–1, et seq.

### (ii) Equal Protection Claim

Finally, Plaintiff argues that in terminating him from the Joint Degree Program, the Defendants violated § 1983 by depriving him of his right to equal protection under the law by treating both women and non-white students more favorably.

▪ In order to succeed on a claim for denial of Equal Protection under the Fourteenth Amendment, a plaintiff must prove "the existence of purposeful discrimination. They must demonstrate that they 'receiv[ed] different treatment from that received by other individuals similarly situated.' Specifically to prove ... discrimination, a plaintiff must show that any disparate treatment was based upon [his] or her gender [or race]." *Keenan v. City of Philadelphia*, 983 F.2d 459, 465 (3d Cir.1992) (citing *Andrews v. Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)). *See also Sims v. Mulcahy*, 902 F.2d 524, 540 (7th Cir.1990) (*prima facie* case for violation of Equal Protection requires showing that plaintiff was member of protected class, was similarly situated to members of unprotected class, and was treated differently from unprotected class).

The burdens of production and persuasion in a discrimination claim brought under the Equal Protection Clause are thus similar to those brought under the federal anti-discrimination statutes. Therefore, for the reasons set forth in Part B(i) of this Opinion, I find that Plaintiff has failed to demonstrate that he was treated differently than other similarly situated students who are not in his protected class, let alone show that any differential treatment was based upon his gender or race. Where, as here, "the record taken as a whole could not lead a rational trier of fact to find for the [Plaintiff], there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). Therefore, I will enter summary judgment in favor of Defendants on Plaintiff's Equal Protection claim.[5]

Accordingly, for the reasons set forth above, Defendants' cross-motion for summary judgment will be granted, and Plaintiff's motion for summary judgment will be denied.[6]

### ORDER

This matter having come before the Court on Plaintiff's motion for summary judgment, or in the alternative, for an order compelling Defendants to divulge the gender and race of all current and former Joint Program students and a trial date certain for August 1997, and Defendants' cross-motion for summary judgment, Allen A. Etish, Esq., and John A. Zohlman, III, Esq., of Kenney & Kearney, Attorneys at Law, appearing on behalf of the Plaintiff, Gavin J. Rooney, Esq., of Lowenstein, Sandler, Kohl, Fisher & Boylan, A Professional Corporation, appearing on behalf of Defendant, Rutgers, The State University of New Jersey, and Peter Verniero, Esq., Attorney General of New Jersey, Katherine L. Suga, Esq., Senior Deputy Attorney General and Bindi S. Chandarana, Esq., Deputy Attorney General, appearing on

---

**5.** I will also enter summary judgment in favor of Defendants and against Plaintiff on Plaintiff's equitable estoppel claim contained in Count V of his complaint as Plaintiff neither defends against the entry of summary judgment in favor of Defendants on this claim, nor argues in favor of the entry of summary judgment in his favor on this claim.

**6.** In light of this Court's grant of summary judgment in favor of Defendants and against Plaintiff, I will also deny Plaintiff's request for an order compelling Defendants to divulge the gender and race of all current and former Joint Program students and a trial date certain for August, 1997. Plaintiff does not allege that the receipt of such information was necessary to defend against Defendants' motion for summary judgment. *See* Fed.R.Civ.P. 56(f). Moreover, in his affidavit, Dr. Seiden testified that:

> [a]s part of a reporting obligation required by certain government agencies, the Joint Program application form provides applicants with the option of identifying their race and sex. The applications completed by the former and current students have already been produced to plaintiff pursuant to prior Court order. The Joint Program does not have any other information concerning the race and gender of these students.

Seiden Aff. ¶ 76.

behalf of Defendants, University of Medicine and Dentistry of New Jersey and Dr. David Seiden; and,

The Court having considered the written submissions of the parties filed in support of, and in opposition to the motions; and,

For the reasons set forth in the Court's Opinion filed concurrently with this Order;

IT IS HEREBY ORDERED on this 1st day of August, 1997, that Defendant's cross-motion for summary judgment is granted; and,

IT IS HEREBY FURTHER ORDERED that Plaintiff's motion for summary judgment, or in the alternative, for an order compelling Defendants to divulge the gender and race of all current and former Joint Program students and a trial date certain for August 1997, is denied.